UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

FEDERAL TRADE COMMISSION,          14-CV-122-WMS-MJR

              Plaintiff,           REPORT AND RECOMMENDATION

     -v-

FEDERAL CHECK PROCESSING, INC.
*et al.*

           Defendants.
_____

This case has been referred to the undersigned by the Hon. William M. Skretny for all pre-trial matters, including preparation of a report and recommendation on dispositive motions. (Dkt. Nos. 158-59). Before the Court is plaintiff Federal Trade Commission's motion for summary judgment. (Dkt. No. 127). For the following reasons, I recommend that the motion be granted in its entirety.

## BACKGROUND

The Federal Trade Commission ("FTC") commenced this action in 2014 alleging that the defendants' debt collection practices violated the FTC Act, 15 U.S.C. §45(a), and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §1692 *et seq.* (Dkt. No. 1). The complaint names two individual defendants, thirteen corporate defendants, and one relief defendant. The individual defendants are William Moses and Mark Briandi. (*Id.*). The corporate defendants are Federal Check Processing, Inc., Federal Recoveries, LLC, Federal Processing, Inc., Federal Processing Services, Inc., United Check Processing, Inc., Central Check Processing, Inc., Central Processing Services, Inc., Nationwide Check Processing, Inc., American Check Procesing, Inc. a/k/a

American Check Processing, State Check Processing, Inc., Check Processing, Inc., US Check Processing, Inc., and Flowing Streams, F.S., Inc.  (*Id.*).  The relief defendant is Empowered Racing LLC.  (*Id.*).

The following facts are taken from the pleadings and motion papers in this action, including the FTC's Statement of Material Facts ("SOF") (Dkt. No. 127-2).  The SOF attaches forty-three exhibits totaling approximately 1,500 pages.  (Dkt. Nos. 129-32).[1] The exhibits consist of consumer declarations, correspondence, business records, telephone recording transcriptions, discovery responses, and other evidence concerning the defendants' unlawful debt collection practices.  The corporate defendants and Empowered Racing have not responded to the FTC's SOF, nor have they submitted any opposition to the FTC's motion.  Briandi's and Moses' respective responses to the FTC's SOF primarily argue that they did not participate in, and were unaware of, the corporate defendants' unlawful debt collection activities.[2]  Therefore, nearly all of the FTC's proposed facts regarding the corporate defendants' unlawful practices are undisputed.  Unless otherwise noted, when citing the FTC's SOF, I have confirmed that the proposed fact is properly supported by evidence and that it has not been controverted with evidence by the defendants.  *See* W.D.N.Y. L.R. Civ. P. 56(a).

---

[1] When citing an exhibit attached to the SOF, I have provided the CM/ECF docket number, the exhibit number, and the page number(s) designated by the FTC.

[2] Briandi also argues that summary judgment should not be entered because "discovery has not been completed by the defense."  (Dkt. No. 151 at 4).  This argument is rejected because the defendants had over one year to pursue discovery.  (*See* Dkt. Nos. 68, 107, 113, 114).  Moreover, Briandi has not set forth the nature of the uncompleted discovery, how those facts are reasonably expected to create a genuine issue of material fact, what efforts have been made to obtain those facts, and why those efforts were unsuccessful.  *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 926 (2d Cir. 1985).

I.      *Corporate Defendants*

A. *Corporate Structure*

Briandi founded Federal Recoveries, LLC in 2009.  (Dkt. No. 127-2 ¶¶2, 20).  The other twelve corporate defendants were established between 2010 and 2013.  (*Id.* ¶¶2-3).  Briandi and Moses co-owned and co-directed each corporate defendant, with the possible exception of Flowing Streams.[3]  (Dkt. No. 132-4, Ex. 35 at 773-79; Dkt. No. 132-6, Ex. 37 at 791-97).  The corporate defendants were part of the same debt collection enterprise, with each entity engaged in collecting consumer debts or supporting other entities engaged in debt collection.  (Dkt. No. 127-2 ¶8).  The corporate defendants ceased collecting debts in February 2014, when this Court granted a temporary restraining order that, among other things, prohibited the defendants from using any false representation or deceptive means to collect a debt, froze the defendants' assets, and appointed a receiver to oversee the corporate defendants.  (Dkt. No. 11).  Between May 11, 2010 and March 10, 2014, the corporate defendants received nearly $11 million from consumers.  (Dkt. No. 127-2 ¶165).

In February 2014, when this Court granted the TRO, the corporate defendants employed twenty-five debt collectors in its office located on Transit Road in East Amherst, New York.  (Dkt. No. 132-8, Ex. 39 at 1084 ¶19).[4]  Three managers — Jennifer Cerne, Jaquie Just, and Michael Timkey — oversaw teams of individual collectors.  (Dkt. No. 127-2 ¶90).  Gary Marcial served as "operations manager" or

---

[3]     Briandi does not recall his interest, if any, in Flowing Streams (Dkt. No. 132-4, Ex. 35 at 776), but Moses states that he and Briandi served as general managers of the entity.  (Dkt. No. 132-6, Ex. 37 at 796).
[4]     The corporate defendants also maintained offices on Wehrle Drive and Bailey Avenue in the Buffalo, New York area, but those offices closed prior to the TRO.  (Dkt. No. 127-2 ¶78).

"office manager," and oversaw the three managers.  (*Id.* ¶¶80, 146).  Another employee, Michael Fix, served as compliance manager.  (Dkt. No. 132-11, Ex. 41 at 1447 ¶11).

  B. *Collection Tactics*

  The corporate defendants collected consumer debts, primarily payday loan debts.  (Dkt. No. 127-2 ¶14).[5]  Defendant Flowing Streams and a predecessor company, Trinity Acquisition Group, purchased these debts from debt sellers who then e-mailed "debt portfolios" directly to Moses or Briandi.  (*Id.* ¶¶12, 124).  Each debt portfolio contained consumer-identifying information, including names and addresses, as well as general information about each debt, such as the balance and the date the debt was issued.  (*Id.* ¶¶125-26).  Because the debt portfolios did not list the interest rate for each debt, Moses created a formula to add interest.  (*Id.* ¶¶127-28).  Moses based the formula on the interest rate in a sample loan contract between the original creditor and the consumer.  (*Id.* ¶130).  Specifically, if a contract existed for a payday loan issued by a particular creditor, Moses applied the interest rate from that contract to each debt that arose out of a payday loan issued by that creditor, even if the debt was in a different portfolio than the debt associated with the contract.  (*Id.* ¶¶130-31).  Moses did not receive formal assurances from the debt seller that interest applicable to a debt in one portfolio could be applied to debts in other portfolios.  (*Id.* ¶134).

  The corporate defendants' debt collectors collected debts from consumers by telephone.  The FTC has submitted numerous recordings and scripts detailing the

---

[5] A payday loan is a short-term loan that typically comes due on the borrower's payday.  To secure the loan, the borrower may give the lender access to his or her checking account or write the lender a check that it may deposit when the loan comes due.  *See* Consumer Financial Protection Bureau, What is a payday loan?, http://www.consumerfinance.gov/askcfpb/1567/what-payday-loan.html (last visited Apr. 5, 2016).

tactics employed by collectors during these calls.[6]   Generally, collectors identified themselves as "processors," "officers," or "investigators" from the "fraud unit" or "fraud division" of the corporate defendants.  (*Id.* ¶¶87, 88).  To persuade consumers to pay debts, collectors accused them of "check fraud" or other crimes, and threatened them with criminal prosecution, legal action, or wage garnishment.  (*Id.* ¶¶89, 90, 96, 97). These accusations and threats were false because not once did the corporate defendants pursue criminal charges or garnishment against a consumer.  (*Id.* ¶¶95, 97). Collectors might also call friends, family members, employers, and coworkers of a consumer, informing them that the consumer owed a debt, had committed check fraud or another crime, and faced pending or imminent legal action.  (*Id.* ¶¶107-15).

Transcripts of telephone calls between collectors and consumers confirm that the collectors used the above tactics.  (Dkt. No. 132-7, Ex. 38 at 799-810 ¶¶5-36).  The transcripts show, for example, that collectors:

- Informed a consumer that she was a "named respondent regarding allegations of pending tax fraud."  (*Id.* at 816).

- Informed a consumer that the call was not a collections call.  (*Id.* at 826).

- Informed a consumer that he was "being processed under a Class A check violation."  (*Id.* at 846).

- Warned a consumer that "[a] $500 check violation is a serious offense in the State of Texas."  (*Id.* at 851).

- Informed a consumer that she was "named as a primary respondent" in a "complaint."  (*Id.* at 886).

---

[6]   The defendants do not argue that the FTC's evidence (*e.g.*, telephone calls, scripts, consumer complaints) is inadmissible, and their failure to do so may be construed as a waiver of any such argument.  *DeCintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 114 (2d Cir. 1987).  In any event, courts have found similar evidence to be admissible under the "Residual Exception" to the hearsay rule, Fed. R. Evid. 807.  *FTC v. Instant Response Sys., LLC*, No. 13 Civ. 00976(ILG)(VMS), 2015 WL 1650914, at *4-5 (E.D.N.Y. Apr. 14, 2015).

- Informed a consumer that he was the "primary respondent in a check violation charge." (*Id.* at 899).

- Answered a telephone call by stating "Fraud Division . . . How can I help you?" (*Id.* at 911).

- Informed a consumer that the corporate defendants "received a claim that was filed against you in our office this morning.  It looks like you're being listed as a primary respondent in two separate violations.  The first is for defrauding a financial institution and the second is for three implications of check fraud." (*Id.* at 928).

- Warned a consumer that the corporate defendants received a "claim" that the consumer took out a loan with "intentions to defraud." (*Id.* at 938-39).

- Informed a consumer that he was the subject of a "hot check violation." (*Id.* at 954).

- Advised a consumer's relative that the corporate defendants "received a pending case file this morning that is outlining three allegations of check fraud" against the consumer.  (*Id.* at 977).

- Advised a consumer that the collector was calling her from "the fraud division here at National Processing Services." (*Id.* at 990).

- Warned a consumer that the corporate defendants were "looking to pursue" the consumer "in court under the state's bad check laws." (*Id.* at 1031).

- Informed a consumer that because he was "settling it outside of court in the pre-arbitrationary [*sic*] phase," he need not be concerned about the settlement appearing on his "permanent record." (*Id.* at 1034).

- Told a consumer that he was "the primary respondent under a check violation charge." (*Id.* at 1046).

- Warned a consumer that the corporate defendants were "calling about the anti-trust complaint violation you have in our office . . . it looks like you tried to defraud the company and you gave them a bad check." (*Id.* at 1052-53).

- Told a consumer "[m]y name is Investigator Edwin Watts.  I'm contacting you — you've been accused of check fraud.  They are requesting that we turn this over to your residing parish to allow you to answer to the pending charges.  I wanted to give you an opportunity to give me your side of the

story before you are picked up on charges . . . I've got to contact the district attorney, hold on." (*Id.* at 1061-63).

- Warned a consumer that "[t]here are strong allegations of alleged check fraud and a theft of goods and service charge that have been filed to forward litigation in San Mateo County." (*Id.* at 1076).

Further, pursuant to the TRO, the FTC obtained numerous unlawful scripts used by collectors when speaking with consumers.  Examples of these scripts include:

- "This msg is intended for <u>dbtr</u>.  This is Kim Carter calling w/ the fraud division of NCP . . . I'm calling in regard to a complaint that was filed & Formalized w/ our office . . . You are listed as primary respondent in regards to allegations of fraud . . . ." (Dkt. No. 130-4, Ex. 16 at 424).

- "[Y]ou do know that when on Government funded 'Fixed income' you have to claim unearned income on your taxes.  You did not file a 1099K form & bcuz of that the IRS can place a hold on your SSI & reevaluate your benefits bcuz soliciting $ w/ no disposable income.  If handled w/ our firm the atty will step in & take care of the 1099K, so you won't be subject to tax ivasion [*sic*]." (*Id.* at 432).

- "This message is intended for ___  My name is Carrie Martin I've been appointed as your representative regarding this matter.  Unfortunatley [*sic*] the complaint was filed and your [*sic*] named as the primary respondant [*sic*].  I would like to get your input prior to any further proceedings Please call me directly . . . ." (*Id.* at 449).

- "Accusations — (1) Illegal or Fraudulent Activity Against a Lending Institute; (2) Theft of Services.  Order of serve & processing." (Dkt. No. 130-5, Ex. 16 at 457).

- "We will send you an agreement notice reflecting the terms we set up.  Upon clearance of your (last) payment, we will send you a release notice.  At that point this will be exsponged of [sic] your credit + criminal record." (*Id.* at 463).

- "—— contacting ——.  Please be advised your disposition was placed on my desk this morning scheduled to be processed within _____ county.  You're being notified that I have been retained to resolve (a possibly) pending legal allegations being filed against you here in my office.  In order to resolve this voluntarily and prevent any further repurcussions [*sic*] I would need your contact as soon as possible.  It is imperative that you contact me directly @ _____ presenting case #_____." (*Id.* at 469).

- "_____   This is Jenna Hodge calling with Federal Processing.   You are being investigated for fraud.   Attached to the complaint is your home & SS# ending in _____.   If you wish to resolve this matter voluntarily before any charges are filed in _____ county, you are mandated to respond." (*Id.* at 487).

- "You are being charged with: - aggrivated [*sic*] defrauding of a Financial institution – Theft of service & intent to defraud a Banking institution." (*Id.*)

- "[L]egally we need to notify "Boss" about you using your work email to facilate [*sic*] fraud – we also need to contact your I.T. DEPT – we need to send a certified state technician to supena [*sic*] the records – supporting evidence suggests you did this/The employer would be liable for this." (*Id.* at 504).

- "Were your intensions [*sic*] for the check to clear? Reckless abandon!" (*Id.* at 516).

The use of these and other scripts was widespread.   Out of the twenty-six collector stations within the corporate defendants' office, fifteen contained a typed script, a handwritten script, or both.   (Dkt. No. 132-8, Ex. 39 at 1084 ¶18).   Michael Fix, the corporate defendants' compliance officer, also had multiple unlawful scripts at the desk he maintained in the office's collection area.   (Dkt. No. 127-2 ¶144).

Not only did collectors threaten consumers, they also routinely withheld material information from them.   For example, collectors refused to discuss the basis for representing that consumers owed debts.   (*Id.* ¶99).   Even if a consumer informed the collector that he or she did not owe the purported debt and provided evidence to support that assertion, the collector continued his or her efforts to collect the debt.   (*Id.* ¶¶100-04).   Collectors also refused to send consumers written correspondence verifying their debts until they agreed to make a payment.   (*Id.* ¶122).   In one instance, a collector even told a consumer that it was not company policy to send letters to consumers.   (*Id.*

¶120).   When the corporate defendants did bother to send letters, they used a form letter that failed to provide information on how to dispute the debt.  (*Id.* ¶118).

The corporate defendants rewarded collectors for using the aforementioned tactics.  For example, one collector who was accused of impersonating law enforcement and contacting third parties regarding debts, Robert Wolfe, received bonuses from the corporate defendants.  (*Id.* ¶¶157, 160).

### C.   *The Assurance of Discontinuance*

On February 3, 2013, without admitting or denying liability, six of the corporate defendants,[7] Briandi, and Moses entered into an Assurance of Discontinuance ("AOD") with the State of New York that resolved the New York State Attorney General's findings that the corporate defendants "repeatedly and persistently violated the FDCPA."  (Dkt. No. 129-14, Ex. 11 at 305-16; *id.* at 308 ¶17).   Among other things, the AOD required Briandi, Moses, and their companies to abide by all applicable federal and state laws, including the FDCPA.  (*Id.* at 309 ¶21).   It further required Moses and Briandi to advise the Attorney General's office if they changed a principal place of business, incorporated a new corporation or business entity, or did business under a new name.  (*Id.* at 311-12 ¶28).   Pursuant to the AOD, on May 8, 2013, Briandi and Moses signed an affidavit in which they represented that they had implemented certain procedures to ensure that the corporate defendants complied with the FDCPA.  (Dkt. No. 132-11, Ex. 41 at 1446-49).

Shortly after the AOD, the corporate defendants began doing business under new names — Nationwide Check Processing, National Processing Service, American

---

[7]    Federal Recoveries, LLC, Federal Check Processing, Inc., Federal Processing Service[s], Inc., Federal Processing, Inc., US Check Processing, Inc., and United Check Processing, Inc.

Check Processing, Central Check Processing, and Central Processing Services.   (Dkt. No. 127-2 ¶65).   One of these entities, Nationwide Check Processing, was incorporated in Colorado in June 2013 by a third-party agent.   (*Id.* ¶66).   During the period in which the corporate defendants collected under the Nationwide name, they used telephone numbers with area codes for Denver, Colorado, even though they placed their calls in East Amherst.   (*Id.* ¶70).   Another "business" operated by the defendants after the AOD, National Processing Service, was an unincorporated business that used a UPS Mailbox in Erie, Pennsylvania as its address.   (*Id.* ¶72).   Collectors began using phone numbers with an Erie area code to make collection calls, even though they placed the calls in East Amherst.   (*Id.* ¶¶72-73).   Further, the corporate defendants used out-of-state addresses and phone numbers to respond to law enforcement inquiries concerning their debt collection practices.   (*Id.* ¶71).

At their respective depositions, the FTC asked Briandi and Moses if they notified the Attorney General that they were doing business under new names, as required by the AOD.   Briandi invoked his Fifth Amendment privilege (Dkt. No. 132-12, Ex. 42 at 1472.4), while Moses testified that he did not recall notifying the Attorney General (Dkt. No. 132-13, Ex. 43 at 1493).   Moses further testified that he did not tell the Attorney General that National Processing Service used an out-of-state mailbox as its business address.   (*Id.* at 1499).

II.   *Moses*

Moses co-owned and co-directed each corporate defendant and possessed signatory power over their bank accounts.   (Dkt. No. 127-2 ¶¶41-43).   Moses also received a salary from the corporate defendants and direct withdrawals from their bank

accounts.  (*Id.* ¶44).   Between 2010 and 2013, Moses' average annual compensation was approximately $280,000.  (Dkt. No. 145 at 2).

Moses was heavily involved in the corporate defendants' operations.   He hired and disciplined employees (Dkt. No. 127-2 ¶¶46-47), determined employee compensation (Dkt. No. 145 at 2), approved scripts used by collectors to make collection calls (Dkt. No. 127-2 ¶53), authored at least one script that failed to inform the consumer that the call was from a debt collector attempting to collect a debt (*id.* ¶54), handled collection calls, some of which led to consumer complaints to the FTC (*id.* ¶¶59-60), received and responded to complaints from state law enforcement and the Better Business Bureau (*Id.* ¶¶55-57; Dkt. No. 132-8), and, along with Briandi, operated Flowing Streams, the entity the corporate defendants used to purchase consumer debts (Dkt. No. 127-2 ¶13).

III.    *Briandi*

Briandi co-owned and co-directed each corporate defendant, with the possible exception of Flowing Streams.  (*Id.* ¶21).   He also had signature authority over their bank accounts.  (*Id.* ¶22).   Between February 10, 2010 and February 26, 2014, the corporate defendants paid Briandi $1,283,558.01.  (*Id.* ¶24).

Briandi maintained a personal office within the corporate defendants' East Amherst office as well as a desk in the collection area.  (*Id.* ¶36; Dkt. No. 150-1[8] at 65-66).   Like Moses, Briandi played a significant role in the corporate defendants' operations.   His "major responsibilities" included signing checks, managing the banking side of the corporate defendants, and ensuring that goods were stocked.  (Dkt. No. 150-

---

[8]    Docket Number 150-1 includes Briandi's complete deposition transcript.   Citations to Briandi's deposition transcript refer to its page numbers.

1 at 176).   Other responsibilities included handling personnel matters (he had the authority to hire and discipline employees) (Dkt. No. 127-2 ¶¶26-27), serving as the contact person for the corporate defendants' phone and internet registry accounts (*id.* ¶29), obtaining a merchant account to receive consumer payments (*id.* ¶30), and, along with Moses, operating Flowing Streams, the entity the corporate defendants used to purchase consumer debts (*id.* ¶13).

In 2009, Briandi regularly handled collection calls, but in subsequent years, he did not handle as many calls.   (Dkt. No. 150-1 at 71-73).   Adrian Fronczak, the corporate defendants' IT Manager, testified that calls were typically "passed to" Briandi. (Dkt. No. at 132-10, Ex. 40 at 1279).   Some of the calls Briandi handled resulted in consumer complaints to the FTC.  (Dkt. No. 127-2 ¶40).

In the twelve to eighteen months before the TRO, Briandi contends that he spent less and less time operating the corporate defendants because he was studying to become a pastor.   Briandi testified that he began his work days by praying in his personal office.  (Dkt. No. 150-1 at 65).   After he prayed, he reviewed the corporate bank accounts before leaving the office to pick up mail and supplies.  (*Id.* at 65-66).  He then returned to the office to take online Bible classes before leaving the office around 2:00 or 3:00 p.m.  (*Id.* at 66).   Briandi testified that in the eighteen months before the TRO, he was "very seldom" at his desk on the collection floor.  (*Id.* at 134).   This testimony conflicts with that of Fronczak, who testified that Briandi spent about half his day at this desk.  (Dkt. No. 132-10, Ex. 40 at 1279).   The desk was twenty feet from the collectors' cubicles.  (Dkt. No. 150-1 at 139).

IV.   _Empowered Racing_

Empowered Racing, a horse racing business established by Briandi, Moses, and two other individuals, received $92,000 from the corporate defendants' bank accounts. (Dkt. No. 132-11, Ex. 41 at 1401; Dkt. No. 127-2 ¶162).   Empowered Racing has not filed an Answer, twice failed to appear for Rule 30(b)(6) depositions, failed to respond to all discovery requests, and is precluded from offering evidence in this action.   (Dkt. No. 127-2 ¶163).

V.   _Procedural History_

The FTC filed its six-count complaint in 2014.  (Dkt. No. 1).   Counts One and Two allege violations of Section 5(a) of the FTC Act, 15 U.S.C. §45(a), against the individual and corporate defendants.   Counts Three, Four, and Five allege violations of the FDCPA, 15 U.S.C. §1692 _et seq._, against the individual and corporate defendants. Count Six alleges unjust enrichment against Empowered Racing.

The same day it filed its complaint, the FTC moved for an _ex parte_ temporary restraining order.   The Court thereafter granted a TRO that, among other things, prohibited the defendants from using any false representation or deceptive means to collect a debt, froze the defendants' assets, and appointed a receiver to oversee the corporate defendants.  (Dkt. No. 11).   One month later, on March 24, 2014, the Court entered a stipulated preliminary injunction with terms similar to the TRO.  (Dkt. No. 43).

In April 2015, the FTC filed a series of discovery and sanctions motions against certain defendants.  Specifically, the FTC filed a motion to compel Moses to produce his Fed. R. Civ. P. ("Rule") 26(a) disclosures (Dkt. No. 104), a motion to compel Rule

30(b)(6) depositions of certain corporate defendants[9] and Empowered Racing (Dkt. No. 106), and a motion for discovery sanctions against the corporate defendants and Empowered Racing (Dkt. No. 108).   The defendants did not respond to any of the motions.

On June 17, 2015, Judge Scott (the Magistrate Judge initially assigned to this action) issued a Report and Recommendation, subsequently adopted by Judge Skretny, directing Moses to produce his Rule 26(a) disclosures within seven days or face preclusion of offering information or witnesses to supply evidence on a motion, at a hearing, or at trial.   (Dkt. No. 113 at 3-4; Dkt. No. 114).   In its summary judgment memorandum of law, the FTC represents that Moses is precluded from offering evidence, which suggests that Moses did not produce his Rule 26(a) disclosures as required by the Court.   (Dkt. No. 128 at 1).   The Report and Recommendation, as adopted, also precludes the corporate defendants and Empowered Racing from offering any evidence in this action.  (Dkt. No. 113 at 5; Dkt. No. 114).

On August 27, 2015, the FTC moved for summary judgment on all six counts in its complaint.  (Dkt. No. 127).   In support of its motion, the FTC argues that recordings, scripts, consumer declarations, complaints, consumer lawsuits, collection letters, and other documents show that the corporate defendants violated the FTC Act and FDCPA. With respect to Moses and Briandi, the FTC argues that they are individually liable for the corporate defendants' wrongdoing because they participated in, or had the authority to control, the corporate defendants' activities, and they had knowledge of their unlawful practices.   The FTC seeks a permanent injunction that would prohibit the corporate

---

[9]      Federal Recoveries, LLC, Federal Processing, Inc., United Check Processing, Inc., Check Processing, Inc., and Flowing Streams, F.S., Inc.

defendants, Moses, and Briandi from engaging in debt collection activities, bar them from making certain misrepresentations with respect to related consumer financial products and service markets, enable the FTC to monitor their compliance with a final order, and impose a money judgment for $10,852,396, *i.e.*, the amount deposited by payment processors into the corporate defendants' bank accounts between May 11, 2010 and March 10, 2014. (*See* Dkt. No. 127-2 ¶165). As for Empowered Racing, the FTC seeks disgorgement of the $92,000 it received from the corporate defendants.

In opposition to the FTC's motion, Moses filed separate responses to the FTC's SOF and its Memorandum of Points and Authorities. (Dkt. No. 145). Moses' opposition is not accompanied by any evidence. On February 2, 2016, Moses belatedly submitted a three paragraph affidavit adopting "all the arguments contained in Mr. Spitler's [Moses' attorney's] affidavit." (Dkt. No. 161 ¶2). Because Mr. Spitler did not submit an affidavit in opposition to the FTC's motion, it appears that Moses' affidavit is referring to his response to the FTC's SOF. In any event, Moses' affidavit is untimely, and the Court has not considered it. Briandi's opposition consists of separate responses to the FTC's SOF and Memorandum as well as a four paragraph affidavit in which he states that he "agree(s) with the contents" of his responses. (Dkt. Nos. 150, 151, 154 ¶3).

In their respective oppositions, Moses and Briandi do not dispute that the corporate defendants engaged in wrongdoing. Rather, they argue that they are not individually liable for any such wrongdoing because they did not control the corporate defendants, participate in their activities, or have any knowledge of their wrongdoing. Moses and Briandi also argue that the FTC's requested relief far exceeds the amount of the defendants' unjust gains.

## DISCUSSION

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  "A genuine dispute of material fact 'exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor.'" *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013) (quoting *Guilbert v. Gardner*, 480 F.3d 140, 145 (2d Cir. 2007)).  Once the moving party has made a properly supported showing of the absence of any genuine issue as to all material facts, the nonmoving party must "come forward with specific facts showing that there is a *genuine issue for trial.*"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks and citation omitted).  While the Court must construe the evidence in the light most favorable to the nonmoving party, *Collazo v. Pagano*, 656 F.3d 131, 134 (2d Cir. 2011), to defeat summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

The Court will separately address summary judgment as to the corporate defendants, Moses, Briandi, and Empowered Racing before turning to the FTC's requested relief.

 I. *Corporate Defendants*

  A. *Common Enterprise*

As an initial matter, the FTC seeks to hold the corporate defendants jointly and severally liable under a "common enterprise theory."  When multiple defendants operate

as a common enterprise, "each entity within a set of interrelated companies may be held jointly and severally liable for the actions of other entities that are part of the group." *FTC v. Tax Club, Inc.*, 994 F. Supp. 2d 461, 469 (S.D.N.Y. 2014). "To determine whether a common enterprise, or a 'maze of interrelated companies,' exists, courts consider 'the pattern and framework of the whole enterprise.'" *FTC v. Vantage Point Servs., LLC*, No. 15-CV-006S, 2015 WL 2354473, at *3 (W.D.N.Y. May 15, 2015) (quoting *Del. Watch Co. v. FTC,* 332 F.2d 745, 746 (2d Cir. 1964)). Factors relevant to this analysis include whether the corporate defendants "(1) maintain officers and employees in common, (2) operate under common control, (3) share offices, (4) commingle funds, and (5) share advertising and marketing." *Tax Club, Inc.*, 994 F. Supp. 2d at 469 (quoting *FTC v. Consumer Health Benefits Ass'n,* No. 10 Civ. 3551(ILG)(RLM), 2012 WL 1890242, at *5 (E.D.N.Y. May 23, 2012)). These factors are easily met here.

The first and second factors are met here because the corporate defendants were owned and directed by the same individuals, Moses and Briandi, and they shared the same employees. Although the employees were technically employed by, and received their paychecks from, Federal Processing, Inc., the employees acted on behalf of all of the entities. (Dkt. No. 127-2 ¶¶10-11). The third factor, shared office space, is met because the corporate defendants shared an office located in East Amherst. The fourth factor, commingling funds, is satisfied because the corporate defendants commingled the funds they received from consumers within their bank accounts. (Dkt. No. 127-2 ¶15). Finally, although it is not clear whether the corporate defendants advertised or marketed themselves, any distinctions between the corporate defendants

were, at most, nominal.  *See Vantage Point Servs., LLC*, 2015 WL 2354473, at *7 (finding, in context of preliminary injunction motion, that debt collection companies operated as common enterprise because any distinctions between the companies were, at most, nominal).  The defendants have not submitted any evidence to raise a genuine issue of fact as to the common enterprise factors.  Therefore, as a matter of law, the corporate defendants operated as a common enterprise, and they are jointly and severally liable for each other's actions.  The Court will now address the FTC's FDCPA claims against the corporate defendants (Counts Three, Four, and Five) before turning to the FTC Act claims (Counts One and Two).

### B. *Count Three (15 U.S.C. §§1692e(1), 1692e(2), 1692e(4), 1692e(5), 1692e(7), 1692e(10), and 1692e(11))*

In Count Three, the FTC alleges that the corporate defendants violated several FDCPA provisions — §§1692e(1), 1692e(2), 1692e(4), 1692e(5), 1692e(7), 1692e(10), and 1692e(11) — by making false, deceptive, and misleading communications to consumers.  "[T]he question of whether a communication complies with the FDCPA is determined from the perspective of the 'least sophisticated consumer.'"  *Jacobson v. Healthcare Fin. Servs., Inc.*, 516 F.3d 85, 90 (2d Cir. 2008).  The purpose of this standard "is to ensure that the statute protects the gullible as well as the shrewd."  *Id.* Further, because the FDCPA is primarily a consumer protection statute, the Court "must construe its terms 'in liberal fashion.'"  *Avila v. Riexinger & Assocs., LLC*, --- F.3d ----, 2016 WL 1104776, at *2 (2d Cir. Mar. 22, 2016) (quoting *Vincent v. The Money Store*, 736 F.3d 88, 98 (2d Cir. 2013)).

### 1. *§1692e(1)*

Section 1692e(1) prohibits a debt collector from falsely representing or implying that it is affiliated with the United States or any state.  Here, the corporate defendants used names (*e.g.*, Federal Recoveries, Federal Processing) that closely resemble those of governmental entities.   Moreover, when they called consumers, the corporate defendants' collectors falsely identified themselves as "officers" and "investigators" before threatening consumers with criminal charges and incarceration.  Based on these facts, the least sophisticated consumer would certainly believe that the corporate defendants were affiliated with the government, in violation of §1692e(1).  (*See* Dkt. No. 129-6, Ex. 7 at 44 ¶5) (consumer believed that the corporate defendants' collector was calling from a "branch of the federal government")); *Alonso v. Blackstone Fin. Grp., LLC*, No. 1:11-cv-01693-SAB, 2013 WL 6843597, at *13 (E.D. Cal. Dec. 20, 2013) (pretending to be an "officer" and providing a case number configured to appear as a legal case number found to violate §1692e(1)).

### 2. *§1692e(2)*

Section 1692e(2) prohibits falsely representing "the character, amount, or legal status of any debt."   "A debt collector that inflates the amount of the debt, whether through unauthorized service fees or otherwise, violates this provision of the FDCPA." *Gathuru v. Credit Control Servs., Inc.*, 623 F. Supp. 2d 113, 122 (D. Mass. 2009).  The corporate defendants inflated debts by using an unreliable "formula" that Moses created to calculate "interest."   Moses did not receive any formal assurances that the formula accurately calculated interest — indeed, the company that sold debts to the corporate defendants, Debt Management Partners, complained that the corporate defendants

were "inflating the balance" of debts.  (Dkt. No. 127-2 ¶137).  The corporate defendants'

practices resulted in consumers paying much more than they actually owed.   For

example, the corporate defendants informed one consumer that she owed nearly

$10,979.07, which she agreed to pay, even though her outstanding balance was listed

as $5,892.58.  (*Id.* ¶128(a)).  Another consumer was told that he owed over $400 when

the debt portfolio listed his debt as $166.04.   (*Id.* ¶128(d)).   These activities violate

§1692e(2).

### 3. *§1692e(4)*

Section 1692e(4) prohibits "[t]he representation or implication that nonpayment of

any debt will result in the arrest or imprisonment of any person or the seizure,

garnishment, attachment, or sale of any property or wages of any person unless such

action is lawful and the debt collector or creditor intends to take such action."   A

collection company that threatens a consumer with legal action despite having a "fixed

practice" of not pursuing such action violates §1692e(4).  *See Tsenes v. Trans-Cont'l*

*Credit & Collection Corp.*, 892 F. Supp. 461, 465 (E.D.N.Y. 1995) (quoting *Sluys v.*

*Hand*, 831 F. Supp. 321, 326-27 (S.D.N.Y. 1993)).   Here, although the corporate

defendants routinely threatened consumers with criminal charges and garnishment, not

once did they pursue this relief against a consumer.  (Dkt. No. 127-2 ¶¶95, 97).  Thus,

they have violated §1692e(4).

### 4. *§§1692e(5), (7)*

Section 1692e(5) prohibits a debt collector from threatening to take any action

that it cannot legally take or that it does not intend to take, while §1692e(7) bars a

collector from falsely representing or implying that the consumer "committed any crime

or other conduct in order to disgrace the consumer." As discussed under §1692e(4), the corporate defendants routinely accused consumers of having engaged in check fraud and threatened them with criminal charges and imprisonment. The corporate defendants had no basis to accuse consumers of check fraud because the majority of the debts they collected on involved defaulted payday loans, not returned checks. (Dkt. No. 127-2 ¶14). Nor did the corporate defendants have any basis to threaten criminal charges because they never pursued (and appear to lack the legal authority to pursue) criminal relief against a consumer. (*Id.* ¶45). Thus, the corporate defendants violated §§1692e(5) and (7).

### 5. *§1692e(10)*

Section 1692e(10) prohibits "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt." The representations discussed under §§1692e(1), (2), (4), (5), and (7) — *e.g.*, impersonating government agents and law enforcement, inflating debts, and threatening to pursue legal action and garnishment — are false and deceptive, in violation of §1692e(10).

### 6. *§1692e(11)*

Section 1692e(11) requires a debt collector to disclose in its initial communication with a consumer "that the debt collector is attempting to collect a debt and that any information obtained will be used for that purpose," and "to disclose in subsequent communications that the communication is from a debt collector." The corporate defendants routinely failed to identify themselves as debt collectors who were calling to collect a debt; they instead pretended to be "officers," "processors," and "investigators" who were calling to investigate "check fraud." In one instance, a collector

flat out told a consumer that he was not calling about "collections."  (Dkt. No. 132-7, Ex. 38 at 826 ("I wanted you to understand, this isn't collections.  I mean, typically, what I deal with here is bad check claims where — a totally different type of case where that would be something handwritten, bounced, and it would be, you know, pursued on that end.")).  Thus, the FTC has shown that the corporate defendants violated §1692e(11).

In sum, the corporate defendants violated each FDCPA provision underlying Count Three.  Therefore, I recommend that summary judgment be granted against the corporate defendants on this count.

## C.  *Count Four (§1692c(b))*

Section 1692c(b) bars debt collectors from communicating with certain third parties (*e.g.*, family members, employers, co-workers) other than for the purpose of obtaining a consumer's contact information, unless the consumer consents to the communication or the communication is reasonably necessary to effectuate a post-judgment judicial remedy.  The FTC has shown that the corporate defendants called consumers' employers, co-workers, and family members without having first obtained the consumers' consent, and that the corporate defendants did not make these calls in furtherance of effectuating a post-judgment judicial remedy.  (Dkt. No. 127-2 ¶¶106-15).  Accordingly, I recommend that summary judgment be granted against the corporate defendants on Count Four.

## D.  *Count Five (§1692g(a))*

Under §1692g(a), unless set forth in the initial communication with the consumer, a debt collector must, within five days of the initial communication, provide the consumer with a written validation notice containing certain information about the debt,

including, among other things, the amount of the debt, the name of the creditor to whom the debt is owed, and a statement that the collector will assume the debt to be valid unless the consumer disputes the debt within thirty days.  The evidence shows that the corporate defendants did not disclose this information in telephone calls or letters to consumers.  In one instance, a collector even told a consumer that it was not company "policy" to send letters.  (Dkt. No. 127-2 ¶120).  Thus, I recommend that summary judgment be granted against the corporate defendants on Count Five.

E. *Counts One and Two (FTC Act)*

Section 5(a)(1) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. §45.  "To prove a deceptive act or practice under §5(a)(1), the FTC must establish three elements:  '[1] a representation, omission, or practice, that [2] is likely to mislead consumers acting reasonably under the circumstances, and [3] the representation, omission, or practice is material.'"  *FTC v. Verity Int'l, Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) (alterations in original) (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)).  "A representation is material if it involves information that is important to consumers, and, hence, likely to affect their choice of, or conduct regarding, a product."  *FTC v. Navestad*, No. 09-CV-6329T, 2012 WL 1014818, at *4 (W.D.N.Y. Mar. 23, 2012) (quoting *FTC v. Cantkier*, 767 F. Supp. 2d 147, 151 (D.D.C. 2011)).  The defendant need not have acted with intent to deceive; rather, "it is enough that the representations or practices were likely to mislead consumers acting reasonably."  *Verity Int'l, Ltd.*, 443 F.3d at 63.

Impersonating law enforcement and falsely accusing consumers of criminal conduct are material misrepresentations likely to mislead reasonable consumers.

Indeed, the FTC has identified consumers who relied on these misrepresentations in deciding to pay the corporate defendants.  (Dkt. No. 129-5, Ex. 6 at 34, 36 ¶¶2, 3, 14; Dkt. No. 129-6, Ex. 7 at 44 ¶7; Dkt. No. 129-7, Ex. 8 at 48 ¶5).  The FDCPA violations discussed above also constitute violations of the FTC Act.   15 U.S.C. §1692(*l*) (providing that an FDCPA violation "shall be deemed an unfair or deceptive act or practice in violation of [the FTC] Act").  Therefore, the corporate defendants violated the FTC Act as a matter of law, and I recommend that summary judgment be granted on Counts One and Two.

II.   *Moses*

An individual may be held liable for corporate acts or practices if he "(1) participated in the acts or had authority to control the corporate defendant and (2) knew of the acts or practices."  *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 320 (S.D.N.Y. 2008);  *see also FTC v. 4 Star Resolution, LLC*, 15-CV-112S, 2015 WL 7431404, at *4 (W.D.N.Y. Nov. 21, 2015) (same).

A.  *Participation in the Wrongful Acts or*
     *Authority to Control the Corporate Defendants*

Moses participated in the corporate defendants' wrongdoing by handling collection calls that led to consumers submitting complaints to the FTC, approving scripts used by collectors to call consumers, and authoring a script that failed to notify the consumer that the call was from a debt collector attempting to collect a debt.  Moses also had the authority to control the corporate defendants, as he was an owner and a director of each entity and, along with Briandi, controlled their bank accounts.  *See 4 Star Resolution, LLC*, 2015 WL 7431404, at *5 ("Defendants do not dispute that the individual defendants here have the authority to control one or more of the Corporate

Defendants, as evidenced by, among other things, bank signatory cards and incorporation or other filings . . . ."); *Instant Response Sys., LLC*, 2015 WL 1650914, at *9 ("Assuming the duties of a corporate officer establishes authority to control."). Therefore, the FTC has satisfied the first element for individual liability against Moses.

B. *Knowledge*

Knowledge may be shown through "actual knowledge of material misrepresentations, reckless indifference to the truth or falsity of such misrepresentations, or an awareness of a high probability of fraud along with an intentional avoidance of the truth." *4 Star Resolution, LLC*, 2015 WL 7431404, at *4 (quoting *FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 574 (7th Cir. 1989)). Subjective intent to defraud is not required. *Amy Travel Serv., Inc.*, 875 F.2d at 574.

The FTC has demonstrated as a matter of law that Moses had actual knowledge of the corporate defendants' misrepresentations, or, at a minimum, that he was aware of a high probability of fraud and intentionally avoided learning the truth. Moses' knowledge stems from his receipt and review of consumer complaints concerning the corporate defendants' misrepresentations and unlawful practices. (Dkt. No. 127-2 ¶¶55-57; Dkt. No. 132-8, Ex. 39 at 1087 ¶31). Moses also knew of the wrongdoing by virtue of the AOD, which states that the corporate defendants were the subject of numerous complaints accusing them of misrepresentations and other misconduct. (Dkt. No. 129-14, Ex. 11 at 305-16). On account of the complaints and the AOD, Moses well knew of the corporate defendants' misrepresentations and unlawful activities. *See Instant Response Sys., LLC*, 2015 WL 1650914, at *9 ("[A]wareness of consumer complaints is probative of knowledge.").

Moses' knowledge also arises from his participation in the corporate defendants' operation, which was permeated with fraud.  *See Med. Billers Network, Inc.*, 543 F. Supp. 2d at 320 ("An individual's degree of participation in business affairs is probative of knowledge."); *Instant Response Sys., LLC*, 2015 WL 1650914, at *9 ("Active involvement in the day-to-day operations of a company . . . is probative of knowledge.").

Finally, the FTC served Requests for Admission asking Moses to admit, among other things, that he knew the corporate defendants violated the FDCPA and other applicable laws.  (Dkt. No. 130-8, Ex. 19 at 558-75).  Moses did not respond to the Requests (*see* Dkt. No. 127-1 ¶10), and his failure to do so is an admission that he knew of the corporate defendants' wrongdoing.  Rule 36(a)(3).

Therefore, for these reasons, no disputed issue of fact exists as to Moses' authority to control the corporate defendants, his participation in their unlawful activities, and his knowledge of their wrongdoing.  Accordingly, Moses is individually liable for the corporate defendants' wrongdoing, and I recommend that summary judgment be granted against him on Counts One through Five.  *See FTC v. Williams, Scott & Assocs. LLC*, No. 1:14-CV-1599-HLM, at 74-75 (N.D. Ga. Nov. 4, 2015) (granting FTC's summary judgment motion and holding individual defendant liable for debt collection company's violations of the FTC Act and the FDCPA).

III.    *Briandi*

The FTC has also established Briandi's authority to control the corporate defendants and his knowledge of their misrepresentations.

A. *Participation in the Wrongful Acts or*
   *Authority to Control the Corporate Defendants*

The undisputed evidence shows that Briandi had the authority to control the corporate defendants, as he served as co-owner and co-director of all but one of the entities and had control over their bank accounts.  *See 4 Star Resolution, LLC*, 2015 WL 7431404, at *5; *Instant Response Sys., LLC*, 2015 WL 1650914, at *9.

B. *Knowledge*

Briandi contends that he lacks actual knowledge of the corporate defendants' misrepresentations because he spent little time in the office, and when he was in the office, he was alone, praying.  But actual knowledge is not the only basis for liability — an individual may also be held liable if he was aware of a high probability of fraud and intentionally avoided learning the truth.  *4 Star Resolution, LLC*, 2015 WL 7431404, at *4.  Such is the case here.

Briandi's awareness of a high probability of fraud and his intentional avoidance of the truth arise from his involvement in the AOD and his actions thereafter.  Specifically, in 2013, Briandi agreed to the AOD, which found that the corporate defendants "repeatedly and persistently violated the FDCPA."  (Dkt. No. 129-14, Ex. 11 at 308 ¶17).  The AOD further provides that the Attorney General, the Better Business Bureau, and the FTC received dozens of complaints accusing the corporate defendants of violating the FDCPA.  (*Id.* at 307 ¶14).  In the complaints, consumers state that the corporate defendants accused them of breaking the law, threatened them with arrest and imprisonment, falsely informed them that a lawsuit has been or would be filed, disclosed their debts to third parties, threatened to seize their property and garnish their wages, and failed to send them validation letters.  (*Id.* at 307-08 ¶15).  Briandi conferred with

the Attorney General's office concerning the AOD, and in May 2013, he signed an affidavit representing that he had taken steps to ensure that the corporate defendants complied with the FDCPA.  (Dkt. No. 132-11, Ex. 41 at 1446-49).

The AOD put Briandi on notice of a high probability of fraud within the corporate defendants' operations.  In the months after the AOD, Briandi should have made sure the corporate defendants complied with the AOD and all applicable laws.  Instead, he put his head in the sand by praying in his office and running errands, all the while receiving substantial compensation.  In charting this course, Briandi intentionally avoided acquiring actual knowledge of the corporate defendants' illegal practices, which continued unabated up until the time of the TRO.  Indeed, pursuant to the TRO, the FTC found numerous consumer complaints in Briandi's personal office and, at his desk on the collection floor, it found a list of civil and criminal penalties for bad checks.  (Dkt. No. 132-8, Ex. 39 at 1083-84, 1087 ¶¶15, 31).  As owner and director of the corporate defendants and a party to the AOD, Briandi cannot skirt liability by pleading ignorance of the corporate defendants' misrepresentations and unlawful practices.[10]  *Instant Response Sys., LLC*, 2015 WL 1650914, at *9 (finding individual defendant's involvement in business and his knowledge of 100 consumer complaints demonstrated, as a matter of law, "an awareness of a high probability of fraud along with an intentional avoidance of the truth") (quoting *FTC v. Five-Star Auto Club, Inc.*, 97 F. Supp. 2d 502, 535 (S.D.N.Y. 2000)); *Williams, Scott & Assocs. LLC*, No. 1:14-CV-1599-HLM, at 73-74 (finding transcripts, recordings of collection calls, and scripts supported individual

---

[10]     The FTC's Requests for Admission asks Briandi to admit, among other things, that he knew of the corporate defendants' wrongdoing.  (Dkt. No. 130-7, Ex. 18).  Briandi did not respond to the Requests until he filed his opposition to the FTC's summary judgment motion (Dkt. No. 153), and he has not proffered any explanation for his delay.  By failing to timely respond, Briandi has admitted his knowledge of the corporate defendants' wrongdoing.  Rule 36(a)(3).  I note, however, that I would still recommend summary judgment against Briandi even in the absence of this admission.

defendant's knowledge of wrongdoing). Thus, there is no genuine dispute of material fact that Briandi, at the very least, had an awareness of a high probability of fraud and intentionally avoided learning the truth of the corporate defendants' practices.

For these reasons, the FTC has established as a matter of law that Briandi had the authority to control the corporate defendants and knew of their wrongdoing. Accordingly, Briandi is individually liable for the corporate defendants' wrongdoing, and I recommend that summary judgment be granted against him on Counts One through Five. *See Williams, Scott & Assocs. LLC*, No. 1:14-CV-1599-HLM, at 74-75 (granting FTC's summary judgment motion and holding individual defendant liable for debt collection company's violations of the FTC Act and the FDCPA).

IV.  *Empowered Racing (Count 6)*

The FTC may obtain disgorgement of funds to which a defendant does not have a "legitimate claim." *FTC v. LeanSpa, LLC*, 920 F. Supp. 2d 270, 281 (D. Conn. 2013). Here, Empowered Racing, a horse racing business established by Moses, Briandi, and two other individuals, received $92,000 from the corporate defendants. Empowered Racing has not appeared in this action and is precluded from offering evidence that it has a legitimate claim to these funds. Accordingly, I recommend that summary judgment be granted against Empowered Racing on Count Six for $92,000.

V.  *Relief*

Section 13(b) of the FTC Act authorizes a permanent injunction for violations of the Act. 15 U.S.C. §53(b). An injunction is warranted where "there exists some cognizable danger of recurrent violation," *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953), or "some reasonable likelihood of future violations," *FTC v. Minuteman*

*Press*, 53 F. Supp. 2d 248, 260 (E.D.N.Y. 1998) (internal quotation marks and citations omitted).  "[T]he commission of past illegal conduct is highly suggestive of the likelihood of future violations."  *SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975).

Injunctive relief is warranted here because the corporate defendants repeatedly violated the FDCPA and FTC Act and failed to comply with the AOD.  *See id.*; *Instant Response Sys., LLC*, 2015 WL 1650914, at *10 (finding that defendant's disregard of prior injunction "portends a 'recurring violation'").  Absent a permanent injunction, there is a reasonable likelihood that the corporate defendants will continue to violate the FTC Act and FDCPA.  Moreover, because Moses and Briandi are jointly and severally liable for the corporate defendants' wrongdoing, injunctive relief is warranted against them as well.  *See Instant Response Sys., LLC*, 2015 WL 1650914, at *11 (granting FTC's motion for summary judgment and entering monetary equitable relief against individual defendant); *Williams, Scott & Assocs. LLC*, No. 1:14-CV-1599-HLM, at 78 (granting FTC's motion for summary judgment and holding individual defendant liable "for monetary equitable relief equivalent to all of the corporate Defendants' net revenue from their illegal [debt collection] activities").

The authority to grant an injunction under the FTC Act "carries with it the full range of equitable remedies."  *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 365 (2d Cir. 2011) (quoting *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468 (11th Cir. 1996)).  In this case, the FTC requests an injunction that would (1) prohibit the defendants from engaging in debt collection activities, (2) ban them from making certain misrepresentations with respect to related consumer financial products and service markets, (3) permit the FTC to monitor their compliance with a final order, and (4) enter

a money judgment for $10,852,396, which represents the corporate defendants' revenue between 2010 and 2014.  (Dkt. No. 128-1 at 23-28).  The defendants oppose the FTC's proposed monetary relief, only.

### A.  *Prohibition on Debt Collection Activities*

Due to the defendants' history of unlawful debt collection practices, they should be enjoined from engaging in debt collection activities.  *See FTC v. Gill*, 265 F.3d 944, 957 (9th Cir. 2001) (affirming injunction prohibiting defendants from engaging in a particular business).  The defendants do not oppose this requested relief, and I recommend that it be granted.

### B.  *Ban on Certain Misrepresentations With Respect to Related Consumer Financial Products and Service Markets*

On account of the defendants' numerous misrepresentations and their unlawful practices toward consumers, they should also be enjoined from making certain misrepresentations with respect to related consumer financial products and service markets.  The defendants do not oppose this requested relief, and I recommend that it be granted.

### C.  *Monitoring*

Based on the defendants' failure to comply with the AOD, monitoring is needed to ensure that they comply with a permanent injunction.  *FTC v. US Sales Corp.*, 785 F. Supp. 737, 753 (N.D. Ill. 1992) (granting monitoring that required the defendants to report their addresses and places of employment or business, and any subsequent changes in this information, to the FTC).  The defendants do not oppose this relief, and I recommend that it be granted.

D. _Monetary Relief_

The authority to grant an injunction "carries with it . . . the power to grant consumer redress and compel disgorgement of profits." _Bronson Partners, LLC_, 654 F.3d at 365 (quoting _Gem Merch. Corp._, 87 F.3d at 468). To obtain disgorgement, the FTC must show that consumers relied on the defendants' misrepresentations. _FTC v. BlueHippo Funding, LLC_, 762 F.3d 238, 244 (2d Cir. 2014); _Instant Response Sys., LLC_, 2015 WL 1650914, at *10 ("Before a court may order restitution under Section 13(b), the FTC must establish a 'presumption' of consumer reliance . . . ."). The FTC is not required to prove each individual consumer's reliance. _BlueHippo Funding, LLC_, 762 F.3d at 244 ("To require proof of each individual consumer's reliance on a defendant's misrepresentations would be an onerous task with the potential to frustrate the purpose of the FTC's statutory mandate."). Rather, the FTC is entitled to a presumption of reliance if "(1) the defendant[s] made material misrepresentations or omissions that 'were of a kind usually relied upon by reasonable prudent persons;' (2) the misrepresentations or omissions were widely disseminated; and (3) consumers actually purchased the defendants' products." _Id._ (quoting _FTC v. Kuykendall_, 371 F.3d 745, 765 (10th Cir. 2004)). The FTC has met all three requirements here.

First, the corporate defendants' misrepresentations were of a kind "usually relied upon by reasonable prudent persons," as a reasonable prudent person threatened with "check fraud" or another crime would strongly consider paying off an alleged debt. Indeed, the FTC has identified consumers who paid the defendants in response to these very threats. _Instant Response Sys., LLC_, 2015 WL 1650914, at *11 (finding a

presumption of consumer reliance in part because the FTC identified consumers who purchased the defendants' services).

Second, as described above, the corporate defendants' misrepresentations were widely disseminated and continued unabated until the TRO.  Pursuant to the TRO, the FTC discovered scripts in fifteen of the twenty-six collector stations in the corporate defendants' office and numerous recordings in which the corporate defendants' collectors impersonated law enforcement and accused consumers of having committed crimes.  *Id.* (evidence of misleading telephone calls and letters satisfies the "widely disseminated" requirement).  Briandi's contention that there are "thousands of telephone calls where no evidence exists of any wrongdoing" is not supported by any evidence. (Dkt. No. 151 at 7-8).

Third, the FTC has identified consumers who relied upon the corporate defendants' misrepresentations in deciding to pay the defendants.  (Dkt. No. 129-5, Ex. 6 at 34, 36 ¶¶2, 3, 14; Dkt. No. 129-6, Ex. 7 at 44 ¶7; Dkt. No. 129-7, Ex. 8 at 48 ¶5); *Instant Response Sys., LLC*, 2015 WL 1650914, at *11 ("The misrepresentations were widely disseminated to hundreds of consumers across the nation, and at least some of these consumers eventually purchased [the defendants'] services.").  Thus, because all three factors are met here, the FTC is entitled to a presumption of consumer reliance, and it may seek disgorgement.

To obtain disgorgement under the FTC Act, the FTC must "first 'show that its calculations reasonably approximated' the amount of the defendant's unjust gains, after which 'the burden shifts to the defendants to show that those figures were inaccurate.'" *Verity Int'l, Ltd.*, 443 F.3d at 67 (quoting *FTC v. Febre*, 128 F.3d 530, 535 (7th Cir.

1997)).  "After the burden shifts, the risk of uncertainty 'fall[s] with the wrongdoer whose illegal conduct created the uncertainty.'"  *Bronson Partners*, *LLC*, 654 F.3d at 368 (alteration in original) (quoting *Verity Int'l, Ltd.*, 443 F.3d at 69).

Here, the FTC calculated the defendants' unjust gains using bank account data showing that between May 2010 and March 2014, the corporate defendants collected $10,852,396 from consumers.[11]  (Dkt. No. 127-2 ¶165).  This calculation reasonably approximates the corporate defendants' unjust gains because the defendants' misrepresentations were widely disseminated and their entire operation was permeated with fraud.  *See BlueHippo Funding, LLC*, 762 F.3d at 244*; Instant Response Sys., LLC*, 2015 WL 1650914, at *11 (finding defendants' $3,432,462 in total gross revenues to be a reasonable approximation of their unjust gains).

The burden now shifts to the defendants to show that the FTC's figures are inaccurate.  *Verity Int'l, Ltd.*, 443 F.3d at 67.  This they have failed to do.  The defendants have not submitted any proof that the corporate defendants earned all or some of their revenue through lawful means.  The defendants could have submitted testimony or declarations from collectors or consumers establishing that some debts were lawfully collected.  Had they done so, a hearing may have been required to determine the amount of disgorgement.  But they did not.  Accordingly, I recommend that the Court grant judgment against the corporate defendants, Moses, and Briandi for $10,852,396.

---

[11]    I note that the corporate defendants began operating in 2009.  Presumably, the FTC lacked documentation concerning the corporate defendants' revenue between 2009 and April 2010.

**CONCLUSION**

I recommend that the FTC's motion for summary judgment (Dkt. No. 127) be GRANTED in its entirety and that the Court enter a final order and judgment (1) prohibiting the corporate defendants, Moses, and Briandi from engaging in debt collection activities, (2) prohibiting the corporate defendants, Moses, and Briandi from making certain misrepresentations with respect to related consumer financial products and service markets, (3) allowing the FTC to monitor the corporate defendants', Moses', and Briandi's compliance with a final order and judgment, (4) granting judgment against the corporate defendants, Moses, and Briandi for $10,852,396, and (5) granting judgment against Empowered Racing for $92,000.[12]

Pursuant to 28 U.S.C. §636(b)(1), it is hereby ORDERED that this Report and Recommendation be filed with the Clerk of Court.

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a), and 6(d) of the Federal Rules of Civil Procedure, and W.D.N.Y. L. R. Civ. P. 72. Any requests for an extension of this deadline must be made to Judge Skretny.

***Failure to file objections, or to request an extension of time to file objections, within fourteen days of service of this Report and Recommendation WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER.*** *See Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989).

---

[12] The FTC has submitted a proposed final order for judgment and permanent injunction. (*See* Dkt. No. 127-3).

The District Court will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the Magistrate Judge in the first instance. *See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir. 1988).

Finally, the parties are reminded that, pursuant to W.D.N.Y. L.R. Civ. P. 72(b), written objections "shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority." ***Failure to comply with these provisions may result in the District Court's refusal to consider the objection.***

**SO ORDERED.**

Dated:      April 13, 2016
            Buffalo, New York

                                        */s/ Michael J. Roemer*
                                        MICHAEL J. ROEMER
                                        United States Magistrate Judge